ROBERT T. MILLER, AN INFANT BY LUCILLE MILLER, HIS NEXT FRIEND, PETITIONER-DEFENDANT IN CERTIORARI, v. C. F. MUELLER CO., RESPONDENT-PLAINTIFF IN CERTIORARI.

Submitted January 16, 1945—Decided March 13, 1945.

Before BROGAN, CHIEF JUSTICE, and Justices DONGES and PERSKIE.

For the petitioner-defendant in *certiorari, Pesin & Pesin* (*Meyer Pesin,* of counsel, on the brief).

For the respondent-plaintiff in *certiorari, Wall, Haight, Carey & Hartpence* (*Edward J. O'Mara,* of counsel).

The opinion of the court was delivered by

BROGAN, CHIEF JUSTICE. The writ brings up for review a judgment of the Pleas in a compensation case. The question presented is whether the employee's injury by accident (which is conceded) arose out of and in the course of his employment. The Deputy Commissioner in the Bureau held that at the time of the accident the petitioner had "deviated from his assigned employment;" that the injury occurred when petitioner was acting in "disobedience of orders" or from an act which he performed for his own amusement. The conclusion was that the petitioner's injuries did not arise out of and in the course of his employment. The petition was dismissed. The Pleas, disagreeing *in toto* with the Bureau's conclusions,

reversed the judgment and awarded compensation. The nature of the question makes necessary a rather full exposition of the facts.

The petitioner, Robert T. Miller, was employed by the Mueller Company, a manufacturer of macaroni, as a "tray boy" whose duty it was to load trays of macaroni onto a truck. This, generally, was the character of the service performed by him for the first four months of his employment. During that time he learned to operate certain machines in use in the plant but in so doing it was not pursuant to any express instruction of the employer. It seems that the petitioner at the time was not old enough—he was still less than eighteen years of age—to work on a machine that carried moving parts. He testified nonetheless that the foreman said it would be "all right" for him to learn to operate a machine and that he actually worked on a machine as a helper to the knowledge of his foreman. He further said that he operated a machine from time to time alone when the regular operator was absent and that he worked on what were known as the "small style macaroni presses" by direction of the foreman; that he worked at other machines to the foreman's knowledge and without objection. His injury resulted from having his fingers caught in a "roller" which, as we understand it, is a machine with moving parts, auxiliary to one called the "kneader." Petitioner further testified that he worked on a kneading machine for two months during the incapacity of its regular operator by assignment of the foreman, Eggeling. This service was in May and June, 1943. He was injured in November of the same year. After June he was employed as a "utility man" helping in one department or another and, as he put it, he "relieved on the macaroni presses" and "now and then on a kneader." All of this, so he said, on the foreman's instructions. He helped as a "relief" in the operation of these several machines from time to time without being told to do so, his statement being "when I was walking about on my spare time or my relief, well, I would go over and help the fellow out if he was behind;" that it was a practice in the plant to relieve or help out others. At or about the time of his injury and for about three weeks prior thereto

his particular duty was the washing of walls in the plant. This assignment was during the "slow season" when production was "ahead of schedule." At such periods all the machines are not operated and the opportunity is taken to clean the machines. On the day of the injury we find it to be the fact that Miller's assigned job was to wash walls. His task at the time placed him in the immediate vicinity of a kneading machine and the roller on which he was injured. Petitioner had finished washing the wall and describes his subsequent actions in the following words: "After I was done on my job I got down off the ladder and I was going to go down to the back, down to the toilet. Well, I stood over by the kneader. There was a small piece of dough lying on top of the table where the rollers are. Well, I started pushing this piece of dough through the rollers. I kept putting it through a few times. ' Well, I would say I was on there about five minutes. * * * There was one fellow on the machine. * * * I didn't talk to him at all. * * * His name was Bobby Trapp. He came over to me and asked me: 'Will you give me a hand I am behind in my work?' You see the machine calls for two men but it was slow at that time. There was only one man on the job, but he had the work piling up on him besides the work he was doing. Well, it was about a minute after he said that I was getting a piece of dough out between the rollers while it was in motion and I don't know, I am not sure whether somebody called me or I turned my head, while I was getting this piece of dough out of the rollers, but I wasn't looking and my fingers got caught. I turned my head away from the machine and they got caught just as soon as I turned my head away from the machine because I had my both hands in there, * * * holding on to the piece of dough that the rollers were getting out. After catching them I shut the machine off and I pulled them out." As a result of this happening petitioner lost his left index and middle finger by amputation.

On cross-examination it appeared that he had worked at washing walls for about two weeks before the accident; that the day before the accident he had been taken off the washing job by the foreman to relieve a fellow workman on the maca-

roni presses; that he worked a press for one hour. It also appeared that at the time his employment with the company started he had misrepresented his true age, stating that he was eighteen years old when in fact he was seventeen. He claimed, however, that his employer knew his right age. He admitted that he was taken off work on the machines when it was discovered that he had not yet reached the age of eighteen.

Shortly after his injury he signed a statement prepared by an investigator which, among other things, said: "I didn't have any authorization to operate the machine in question but I wanted to assist a co-worker. Al Eggeling, my boss, didn't know I was working on the machine." This admission was limited to the day on which he was injured for he further testified that on the day before the foreman, Eggeling, had asked him to help out on a macaroni press for an hour.

The next witness, Schnaars, a former employee of the respondent, corroborated the petitioner in that he had seen him working on a kneading machine for a period of three weeks or a month; that he himself had used Miller for relief. The fact that Miller worked on a machine the day before the accident was also corroborated by the witness, McLaughlin, a former employee, who testified that it was a practice or custom to ask employees to relieve one another.

On behalf of the respondent, an employee, Hulett, testified that he worked in the crew with the petitioner washing walls; that the wall job had not been finished when the petitioner left it to go elsewhere. This witness, however, admitted that he also was called upon to do "press work" at intervals; that the petitioner was also called on one occasion to relieve on press work and corroborated the fact that this "relief" by the petitioner was given a day or so before the accident.

Ackerman, also a member of the group which washed walls, testified he saw petitioner put a piece of dough through the rollers and repeat the operation immediately before his injury. He said that Trapp, the operator of the machine, was facing in the opposite direction away from Miller; that no conversation passed between them. This witness did not see the accident although he was standing close by. Trapp, the opera-

tor of the machine, testified that immediately prior to the accident he had been cleaning the "dough break;" that he saw Miller about fifteen minutes before the accident; that Miller watched him cleaning the machine; that the machine had been lying idle for "quite a while," and required cleaning; that excess dust is removed by rubbing with a cloth and that finally a piece of dough is repeatedly put through the rollers to take up grit and dust. He denied engaging in conversation with Miller; denied he asked his help; said that his machine had been cleaned and was ready for use but that no dough had been put into it at the time for purposes of manufacture; that he was not behind with his work that day; that he had seen the petitioner put a piece of dough into the machine; that he gave him no "authority" to do it because he didn't have such authority. On cross-examination he admitted that the petitioner had, on other occasions, helped on this machine as well as others; that the petitioner had never worked with him but that he had seen him work on a machine. He described the petitioner's action in putting the piece of dough through the rollers as "playing around" but said he didn't tell him to stop doing it.

The foreman, Eggeling, testified that he had not assigned petitioner to operate the machine on the day in question. He described the machine as a "dough break" as distinguished from a "kneader;" said that on that particular day the petitioner was not under his supervision, having been assigned to a different job for which there was a different foreman. He admitted that during Trapp's incapacity, some months previously, he had assigned petitioner to work on the kneading machine and that petitioner operated it for a period of one to two months; he said that normally the operation of this machine, in conjunction with the dough break, required the services of two men but that on the day of the accident Trapp was alone; that there was little work for the dough break at the time and that Trapp could do the work required on both machines. On cross-examination he admitted that he had assigned the witness, Hulett, the day before to help on this machine, taking him off the wall washing task. At this juncture it is entirely clear from the testimony of this witness

that he knew that employees such as petitioner "helped out" on machines and that any rule against so doing was honored more by its breach than by its observance. That is our conclusion of fact on this element of the case. The petitioner, on rebuttal, stated that on the day before the accident he was directed by the foreman, Eggeling, to "relieve the fellow" on the machine; further, that just prior to his injury Trapp, the operator, asked him to help out which he immediately proceeded to do.

Appraising the testimony before us, we find that Miller operated the machine on which he was injured because he was asked to do so by a fellow employee; that such had been an established custom in the plant about which the superiors had knowledge and in which they acquiesced. This conclusion, as we read the case, is completely supported by the employer's witnesses. Further, the testimony of the petitioner carries the indicia of truth. His admissions against interest were made with no attempt at evasion. He stated that the particular machine operation which resulted in his injury was undertaken "without authority" from the foreman on that day, notwithstanding that he had such assignment from the foreman on the previous day.

The argument of the prosecutor of the writ addresses itself to this vital statutory point: that the accident did not arise out of and in the course of the employment. The argument is grounded on the theory of deviation. It may be conceded that there was deviation in a literal sense. But such was the practice. The employer, however, not only tolerated this practice but acquiesced in it. Deviation, thus approved by the plant superior, should not serve as a benefit to the employer and weigh against the petitioner. The cases advanced to support the respondent's argument—*Hanover* v. *Pennbrook Golf Club*, 10 *N. J. Mis. R.* 378; *Colucci* v. *Edison Portland Cement Co.*, 94 *N. J. L.* 542, and *Grotski* v. *Charles Grotski, Inc.*, 121 *Id.* 462—are neither applicable nor controlling for the reason that in these cases the deviation, indulged for the first time, resulted in injury to the petitioner. In contrast, the deviation in this case was sanctioned by custom and brought about in some instances by the order or

direction of a superior. The distinguishing features between the facts in the cited cases and the facts here in proof are too clear to require discussion.

It is further argued that at the time of the injury the petitioner "was acting in disobedience of orders" or indulging in "horseplay." In support of the "disobedience of orders" feature *Reis* v. *Breeze Corporations, Inc.,* 129 *N. J. L.* 138, is cited; in support of the "horseplay" argument *Hulley* v. *Moosbrugger,* 88 *Id.* 161. Neither point is meritorious. As we have already held, the act of the petitioner at the time of his injury, undertaken to assist a fellow employee, had all the validity that custom and tacit acquiescence on the part of superiors could impart to it. Consequently there was no disobedience in it (Compare *Dubit* v. *Sheffield Farms,* 118 *Id.* 411). Nor was there any element of "horseplay" (as we understand the term) in the conduct of the petitioner at the time of or just previous to the accident. When he started at the machine, prior to the request from Trapp to help out, he might be said to have been working the machine for his own satisfaction or perhaps amusement, but at the time of the injury he was engaged in the performance of an undertaking in aid of his fellow employee. We find the petitioner suffered injury by accident which arose out of and in the course of his employment.

The judgment of the Pleas should be affirmed, with costs.